IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| VERNA CRAMER, | ) |
| | ) |
|     Plaintiff, | ) |
| | ) |
|        vs. | )   Civil Action No. 05-414J |
| | ) |
| JO ANNE B. BARNHART, | ) |
| Commissioner of Social Security, | ) |
| | ) |
|     Defendant. | ) |

**MEMORANDUM OPINION**

## I.    INTRODUCTION

Pending before the Court are cross-motions for summary judgment filed by Plaintiff Verna Cramer and Defendant Jo Anne B. Barnhart, Commissioner of Social Security.  Plaintiff seeks review of final decisions by the Commissioner denying her claims for disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401 *et seq.*, and supplemental security income benefits ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381 *et seq.*[1]  For the reasons discussed below, Plaintiff's motion is denied and Defendant's motion is granted.

---

[1]  A person is eligible for supplemental security income benefits if he is "disabled" (as that term is defined elsewhere in the regulations) and his income and financial resources are below a certain level.  42 U.S.C. § 1382(a).  To be granted a period of disability and receive disability insurance benefits, a claimant must show that he contributed to the insurance program, is under retirement age, and became disabled prior to the date on which he was last insured.  42 U.S.C. § 423(a).

## II.   **BACKGROUND**

### A.   Factual Background

Verna Cramer worked as a food packager and bartender for some fifteen years until she became unable to work as of June 29, 2003,[2] due to rheumatoid arthritis and fibromyalgia. At the time she applied for benefits, Ms. Cramer stated that she could not work due to problems with her arms, hands, legs, feet, back, hips, memory, eyes and balance. (Certified Copy of Transcript of Proceedings before the Social Security Administration, Docket No. 8, "Tr.," at 108.) As a result of these conditions, she was always falling, had difficulty walking and holding or lifting objects, was "tired all the time," and suffered memory loss. (Id.)

### B.   Procedural Background

On June 6, 2003, Ms. Cramer protectively filed for disability and supplemental security income benefits (Tr. 99-101 and 317-321, respectively.) Both applications were initially denied on January 27, 2004[3] (Tr. 76-79; 323-327), after which Plaintiff timely requested a hearing before an Administrative Law Judge ("ALJ") on March 25, 2004. (Tr. 80.)

On May 17, 2005, a hearing was held before the Honorable

---

[2] Plaintiff initially claimed that she had become unable to work as of January 1, 2002, but her onset date was later amended to June 29, 2003, when it became evident that she had worked after the date initially proposed. (Tr. 118.)

[3] The date of January 27, 2003, on each letter appears to have been a clerical error inasmuch as they refer to medical records received between September and December 2003.

Douglas W. Abruzzo at which Plaintiff was represented by counsel. Judge Abruzzo issued his decision on June 21, 2005, again denying DIB and SSI benefits.  (Tr. 13-22.)  The Social Security Appeals Council declined to review the ALJ's decision on September 2, 2005, finding no error of law or abuse of discretion and concluding the decision was based on substantial evidence to support the ALJ's findings.  (Tr. 5-7.)  Therefore, the June 21, 2005 opinion became the final decision of the Commissioner for purposes of review.  42 U.S.C. § 405(h); Rutherford v. Barnhart, 399 F.3d 546, 549-550 (3d Cir. 2005), citing Sims v. Apfel, 530 U.S. 103, 107 (2000). Plaintiff filed suit in this Court on November 7, 2005, seeking judicial review of the ALJ's decision.

     C.   Jurisdiction

     This Court has jurisdiction by virtue of 42 U.S.C. § 1383(c)(3) (incorporating 42 U.S.C. § 405(g)) which provides that an individual may obtain judicial review of any final decision of the Commissioner by bringing a civil action in the district court of the United States for the judicial district in which the plaintiff resides.

**III. STANDARD OF REVIEW**

     The scope of review by this Court is limited to determining whether the Commissioner applied the correct legal standards and whether the record, as a whole, contains substantial evidence to support the Commissioner's findings of fact.  42 U.S.C. § 405(g);

3

Richardson v. Perales, 402 U.S. 389 (1971); Schaudeck v. Comm'r of Soc. Sec. Admin., 181 F.3d 429, 431 (3d Cir. 1999). Findings of fact by the Commissioner are considered conclusive if they are supported by "substantial evidence," a standard which has been described as requiring more than a "mere scintilla" of evidence, that is, equivalent to "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson, id. at 401. "A single piece of evidence will not satisfy the substantiality test if the [ALJ] ignores, or fails to resolve a conflict, created by countervailing evidence." Kent v. Schweiker, 710 F.2d 110, 114 (3d Cir. 1983).

This Court does not undertake de novo review of the decision and does not re-weigh the evidence presented to the Commissioner. Schoengarth v. Barnhart, 416 F. Supp.2d 260, 265 (D. Del. 2006), citing Monsour Medical Center v. Heckler, 806 F.2d 1185, 1190 (3d Cir. 1986) (the substantial evidence standard is deferential, including deference to inferences drawn from the facts if they, in turn, are supported by substantial evidence.)  If the decision is supported by substantial evidence, the Court must affirm the decision, even if the record contains evidence which would support a contrary conclusion. Panetis v. Barnhart, CA No. 03-3416, 2004 U.S. App. LEXIS 8159, *3 (3d Cir. Apr. 26, 2004), citing Simmonds v. Heckler, 807 F.2d 54, 58 (3rd Cir. 1986), and Sykes v. Apfel, 228 F.3d 259, 262 (3rd Cir. 2000).

IV.   **LEGAL ANALYSIS**

A.   The ALJ's Determination

In determining whether a claimant is eligible for supplemental security income or disability insurance benefits, the burden is on the claimant to show that he has a medically determinable physical or mental impairment (or combination of such impairments) which is so severe he is unable to pursue substantial gainful employment[4] currently existing in the national economy. The impairment must be one which is expected to result in death or to have lasted or be expected to last for not less than twelve months.   42 U.S.C. § 1382c(a)(3)(C)(i); Morales v. Apfel, 225 F.3d 310, 315-316 (3d Cir. 2000).

To determine a claimant's rights to either SSI or DIB,[5] the ALJ conducts a formal five-step evaluation:

(1)   if the claimant is working or doing substantial gainful activity, he cannot be considered disabled;

(2)   if the claimant does not suffer from a severe impairment or combination of impairments that significantly limits his ability to do basic work activity, he is not disabled;

(3)   if the claimant does suffer from a severe impairment

---

[4]   According to 20 C.F.R. § 416.972, substantial employment is defined as "work activity that involves doing significant physical or mental activities. . . . Work may be substantial even if it is done on a part-time basis."  "Gainful work activity" is the kind of work activity usually done for pay or profit.

[5]   The same test is used to determine disability for purposes of receiving either type of Social Security benefits.  Burns v. Barnhart, 312 F.3d 113, 119, n1 (3d Cir. 2002).  Therefore, courts routinely consider case law developed under both SSI and DIB applications.

which meets or equals criteria for an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("the Listings") and the condition has lasted or is expected to last continually for at least twelve months, the claimant is considered disabled;

(4) if the claimant retains sufficient residual functional capacity ("RFC")[6] to perform his past relevant work, he is not disabled; and

(5) if, taking into account the claimant's RFC, age, education, and past work experience, the claimant can perform other work that exists in the local, regional or national economy, he is not disabled.

20 C.F.R. § 416.920(a)(4); *see also* Morales, 225 F.3d at 316.

In steps one, two, and four, the burden is on the claimant to present evidence to support his position that he is entitled to Social Security benefits, while in the fifth step the burden shifts to the Commissioner to show that the claimant is capable of performing work which is available in the national economy.[7] Sykes v. Apfel, 228 F.3d 259, 263 (3d Cir. 2000).

Following the prescribed analysis, Judge Abruzzo first concluded that Ms. Cramer had not engaged in substantial gainful activity since her amended onset date of June 29, 2003. (Tr. 14.) Resolving step two in Plaintiff's favor, the ALJ found that she

---

[6] Briefly stated, residual functional capacity is the most a claimant can do despite her recognized limitations. Social Security Ruling 96-9 defines RFC as "the individual's maximum remaining ability to perform work on a regular and continuing basis, i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule."

[7] Step three involves a conclusive presumption based on the listings, therefore, neither party bears the burden of proof at that stage. Sykes, 228 F.3d at 263, n2, *citing* Bowen v. Yuckert, 482 U.S. 137, 146-147 n5 (1987).

suffered from rheumatoid arthritis,[8] but her hiatal hernia and blurred vision were not "severe impairments" as that term is defined by the Social Security Administration ("SSA").[9]  As such, the ALJ did not consider those conditions in his subsequent analysis.[10]

At step three, the ALJ concluded that Plaintiff's rheumatoid arthritis did not satisfy any of the criteria in Listing 14.00 Immune System, in particular, Listing 14.09 Inflammatory Arthritis, or any other impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (Tr. 14-18.)  At step four, the ALJ concluded Ms. Cramer could not perform her previous work as a bartender, which

---

[8]  Rheumatoid arthritis is a chronic systemic autoimmune disease which causes inflammation of the joints and surrounding tissues.  It initially attacks the synovium, the connective tissue that lines the cavity between joints and secretes a lubricating fluid.  The pattern of joints affected is usually symmetrical and the pain is worse in the morning. Unlike osteoarthritis which is limited to the joints, rheumatoid arthritis may involve other body organs.  See www.merck.com, Merck Manual Home Edition, "Rheumatoid Arthritis."

[9]  See 20 C.F.R. §§ 404.1520(c), 404.1521(a), and 140.1521(b), stating that an impairment is severe only if it significantly limits the claimant's "physical ability to do basic work activities," i.e., "abilities and aptitudes necessary to do most jobs, including, for example, walking, standing, sitting, lifting, pushing, pulling, reaching, carrying or handling," as compared to "a slight abnormality" which has such a minimal effect that it would not be expected to interfere with the claimant's ability to work, regardless of his age, education, or work experience.  Yuckert, 482 U.S. at 149-151.  The claimant has the burden of showing that the impairment is severe.  Id. at 146, n5.

[10]  We note the ALJ did not make an explicit finding as to the severity of Ms. Cramer's purported fibromyalgia, although it is mentioned in passing in his decision.  (See, e.g., Tr. 16.)  Plaintiff does not raise this omission on appeal and we conclude any argument pertaining thereto has been waived.

the vocational expert ("VE") at the hearing, Mr. Mark L. Heckman,
had described as semi-skilled, light to medium work.  (Tr. 65.)

In response to the ALJ's hypothetical question, Mr. Heckman
stated there were numerous light[11] jobs such as ticket seller,
router/sorter, or coupon redemption clerk and sedentary[12] jobs such
as a product inspector, nut sorter, or ampoule sealer which an
individual of Ms. Cramer's age, education, and physical/mental
limitations could perform in the local or national economy.  (Tr.
19.)  Based on Plaintiff's status as a younger individual[13] with a
tenth grade education, a work history of semi-skilled occupations,
the medical evidence of record, and the testimony of the VE, the
ALJ determined at step five that Ms. Cramer was not disabled and,

---

[11]   "Light work involves lifting no more than 20 pounds at a time
with frequent lifting or carrying of objects weighing up to 10 pounds.
Even though the weight lifted may be very little, a job is in this
category when it requires a good deal of walking or standing, or when
it involves sitting most of the time with some pushing and pulling of
arm or leg controls. To be considered capable of performing a full or
wide range of light work, [the claimant] must have the ability to do
substantially all of these activities."  20 C.F.R. §§ 404.1567(b) and
416.967(b).  A person who is able to do light work is also assumed to
be able to do sedentary work unless there are limiting factors such as
loss of fine dexterity or the inability to sit for long periods of
time.  Id.

[12]   The term "sedentary" describes work which requires lifting no
more than 10 pounds at a time and occasionally lifting or carrying
articles like docket files, ledgers and small tools.  Jobs are
sedentary even if walking and standing are required occasionally and
other sedentary criteria are met.  20 C.F.R. § 404.1567. A sedentary
job should require no more than approximately 2 hours of standing or
walking per eight-hour work day, and sitting should typically amount
to six hours per eight-hour work day.  Social Security Ruling 83-10.

[13]   Plaintiff was 44 years old at the time of the hearing, making
her a "younger" person according to Social Security regulations.  20
C.F.R. § 404.1563(c) and § 416.963(c).

8

consequently, not entitled to benefits.  (Tr. 20.)

Plaintiff argues the ALJ's determination was not based on substantial evidence for two reasons.  First, he failed to evaluate the medical opinions of Dr. Carlos Wiegering and Dr. Raymond Francis using the criteria set forth in 20 C.F.R. §§ 404.1527 and 416.927.   (Plaintiff's Brief in Support of Motion for Summary Judgment, Docket No. 11, "Plf.'s Brief," at 7-8.)   Second, ALJ failed to provide a proper rationale for his ultimate finding on her residual functional capacity.  (Id. at 9-10.)  We address each of those arguments in turn.

B.    Argument 1: Failure to Properly Evaluate Medical Opinions

According to Plaintiff, the ALJ improperly evaluated the opinions of two physicians concerning her ability to perform work related functions.  Dr. Wiegering examined Plaintiff on October 21, 2003, at the request of the SSA.  He concluded she could only sit, stand and walk for 10 minutes and was limited to lifting and carrying no more than two or three pounds.  (Plf.'s Brief at 7.) Dr. Francis, who examined Plaintiff on November 25, 2003, also at the request of the SSA, concluded she had marked limitations in making judgments on simple, work-related decisions.   Ms. Cramer argues that despite the lack of contradictory findings by any other treating or examining medical sources, the ALJ found she could perform light exertional work and simple repetitive tasks, a conclusion entirely inconsistent with the opinions of Drs.

Wiegering and Francis.   (Plf.'s Brief at 8.)   She particularly objects to the fact that although the ALJ stated he was required to follow 20 C.F.R. §§ 404.1527 and 416.927 in evaluating those opinions, he "utterly" failed to do so. The ALJ mentioned that Dr. Wiegering's opinion was based on direct examination, but failed to discuss other criteria of the regulations, e.g., supportability, consistency with other medical evidence, and Dr. Wiegering's speciality or lack thereof.   (Id.)

　　　　1.   *Dr. Wiegering's Conclusions:*   Dr. Wiegering, a physician with the Pennsylvania Bureau of Disability Determination, noted that Plaintiff had been diagnosed with rheumatoid arthritis and fibromyalgia some three years before the examination.   (Tr. 215.) On examination, Ms. Cramer complained of aches and pains on palpation throughout her spinal area and had only a limited range of motion in her lumbosacral spine.   Although straight leg elevation in a supine position was deemed to be positive at 25 degrees,[14] the range of motion in her lower extremities was described as "well preserved" and the range of motion from her shoulders to fingers was "well within normal limits." (Tr. 217.) Her main complaint was swelling of the hands, fingers and feet with "achiness" in the remainder of her body associated with almost

---

[14]　Positive straight leg-raising tests have been held to be objective medical evidence of back pain.  See Greene v. Barnhart, CA No. 05-1719, 2006 U.S. Dist. LEXIS 42922, *18-*19 (E.D. Pa. June 26, 2006), citing cases.

every activity or motion.  (Tr. 218.)  She reported that although the swelling in her hands and feet decreased with activity during the day, her pain was such that she could not perform the activities of daily living.  Dr. Wiegering commented that despite the swelling in her hands, she was able to perform "fine and dexterous movements," albeit with pain and difficulty.  Her gait was described as "antalgic and slow," but her normal reflexes were "well preserved."  (Tr. 218.)

Dr. Wiegering concluded,

> The functional capacity of this patient has been compromised, in view of her constant and persistent achiness and pain.  She is probably able to perform some lifting and carrying of about 2 or 3 pounds, on a more than less frequent basis.  Standing and walking are pretty much limited to no more than 10 minutes, in view of the aches, pains and back pains.  In sitting, less than 10 minutes, in view of the positional pain.

(Tr. 217.)  He further opined that Plaintiff would be unable to push or pull due to "generalized weaknesses of the upper and lower extremities and associated aches and pain."  She would be able to crouch and kneel only occasionally and would need help getting up from a kneeling position.  (Tr., id.)

In a follow-up review completed in late October or early November 2003, Dr. Wiegering commented that Ms. Cramer's reflexes were within normal limits and there was no muscle atrophy.  Her fine and dexterous movements (e.g., picking up coins from a flat surface, managing zippers and buttons, turning pages of a book, tying shoes) in both right and left hands were within normal

limits, albeit with pain.   (Tr. 219-220).   As in the first
evaluation, he considered the motor power of her arms and legs was
3 out of 5, indicating an ability to move against gravity, but not
against resistance.[15]   (Tr. 219.)

In his first report, Dr. Wiegering noted that Plaintiff
"presented with some potential for depression in lieu of [sic] her
medical condition, and the inability of the patient to perform
activities of daily living." (Tr. 215.)   In his second report, he
opined that she had "major depression." (Tr. 219.)  He provides no
medical basis for these conclusions and there is nothing in the
record from which to conclude that he was a specialist in mental
impairments.

2.   *Dr. Francis's Conclusions:*   Dr. Francis, a
psychologist   with   the   Pennsylvania   Bureau   of   Disability
Determination, described Plaintiff as "a very angry woman who
[feels] that she has been mistreated/diagnosed by [the] medical
profession and only now has she come to believe that some of this
[sic] listened to her and found the nature of her problem." (Tr.
221.)   She reported to Dr. Francis that some four or five years
earlier, she had been diagnosed "most likely" with fibromyalgia but

---

[15]   "Motor strength is scaled as follows: 0/5 (no movement); 1/5
(trace movement); 2/5 (movement with the aid of gravity); 3/5
(movement against gravity but not resistance); 4/5 (movement against
resistance supplied by the examiner); 5/5 (normal strength)."
Hipkins v. Barnhart, 305 F. Supp.2d 394, 396, n1 (D. Del. 2004),
citing The Merck Manual of Diagnosis and Therapy, § 14, at 1347 (17th
ed. 1999).

was told by physicians that her problem was emotional.  (Tr. 221.)
As her hands and feet continued to swell, she was sent to a pain
clinic in Dubois, Pennsylvania, and to a psychiatrist.[16]  She was
eventually diagnosed with rheumatoid arthritis for which she was
prescribed methotrexate.  Despite treatment, she found her memory
was impaired and she continued to suffer sharp pains, constant
aching and throbbing in all parts of her body.  (Tr. 222.)  Dr.
Francis noted Plaintiff had an "unusual stance and gait, which was
awkward."  (Tr. 221.)  She also had difficulty when she moved from
standing to sitting and vice versa.  (Tr. 223.)

Ms. Cramer reported she was able to do some household
activities such as laundry and washing dishes because "she knows
she has to force herself to keep moving or she will lock up
entirely."  She stated she had to rest "a good bit" intermittently
with activity.  Her social interactions were limited.  (Tr. 222.)
Although she demonstrated a "tremendous amount of anger" in the
interview, she was able to maintain eye contact and express herself
with reasonable facility.  Dr. Francis noted she was "busy trying
to avoid pain and this is her major issue."  (Tr. 223.)

---

[16]  The Court has been unable to identify any records of treatment
in Dubois, or by a psychiatrist.  In fact, on July 15, 2003, when it
was proposed that she consult a psychologist for help in dealing with
her pain, she declined such assistance, stating "she doesn't believe
that she needs to see a psychologist or a psychiatrist for her
problem" and denying any depressive symptoms.  (Tr. 162.)  Ms. Cramer
also indicated in her daily activities questionnaire that
psychological or psychiatric treatment had not been recommended to
help her cope with pain.  (Tr. 141.)

In his evaluation, Dr. Francis noted Ms. Cramer was capable of maintaining goal directions in speech, with normal cadence and no evidence of breaks in logic or associative thinking. (Tr. 223.) Her abstract reasoning was not impaired; information and intelligence were apparently average. (Tr. 223-224.) She "did an adequate job" on mental ability tests and was "appropriately oriented in all series." (Tr. 224.)

Dr. Francis believed that from Ms. Cramer's reports, he was able to obtain a "reliable picture of her adjustment." (Tr. 221.) His diagnosis was "undifferentiated somatoform disorder; major depressive disorder, recurrent, mild." (Tr. 224.) He concluded she had a poor prognosis: "This woman is clear in her mind that she has real pain and has responded somewhat positively on medication. A number of physicians have obviously felt that her pain was more psychosomatic, perhaps she will get some assistance at the present time." (Tr. 224.) He also found she had "some difficulty in concentrating" and was "troubled with some memory issues." With regard to activities of daily living, she "recognizes what is to be done but limits herself appropriately to avoid discomfort" and "needs to rest frequently for long periods of time." Her pace of activity was slow and "governed by her level of pain at any given moment." (Tr. 225.)

Dr. Francis completed a mental assessment form in which he noted a slight restriction in Plaintiff's ability to understand,

14

remember short, simple instructions and a moderate restriction in the ability to understand and remember detailed instructions. Her ability to carry out detailed instructions and make judgments about simple work related decisions was markedly restricted.[17] (Tr. 226.) However, she was able to interact appropriately with the public and co-workers without restriction and with only slight restriction with supervisors. She could respond appropriately to work pressures in usual work settings and to changes in routine work settings with only moderate limitations. (Tr. 226.)

3. *Analysis:* We first note that the Social Security Administration has developed a hierarchy by which the opinions of medical sources are to be evaluated. The regulations identify three general categories of medical sources: treating, non-treating, and non-examining.[18] 20 C.F.R. § 416.902. Physicians, psychologists and other acceptable medical sources who have provided the claimant with medical treatment or evaluation and who have had an "ongoing treatment relationship" with him are considered treating sources. A non-treating source is one who has examined the claimant but does not have an ongoing treatment

---

[17] The record contains an illegible comment about medical/clinical findings to support this assessment. (Tr. 226.)

[18] Certain other individuals who, although not categorized as "acceptable medical sources," may provide evidence to show the severity of the alleged impairment and how it affects the claimant's ability to work. These individuals include other medically-related sources such as nurse-practitioners, physicians' assistants, naturopaths, chiropractors, audiologists, and therapists. 20 C.F.R. § 404.1513(d).

relationship with him, for example, a one-time consultative examiner. Id. Finally, non-examining sources, including state agency medical consultants, are those whose assessments are premised solely on a review of medical records. Id.

The Social Security regulations also carefully set out the manner in which medical opinions are to be evaluated. 20 C.F.R. § 404.1527. In general, every medical opinion received is considered. Unless a treating physician's opinion is given "controlling weight" (as discussed below), the ALJ will consider (1) the examining relationship (more weight given to the opinion of an examining source than to the opinion of a non-examining source); (2) the treatment relationship (more weight given to opinions of treating sources); (3) the length of the treatment relationship and the frequency of examination (more weight given to the opinion of a treating source who has treated the claimant for a long time on a frequent basis); and (4) the nature and extent of the treatment relationship (more weight given to the opinions of specialist than to generalist treating sources.) 20 C.F.R. §§ 404.1527(d) and 416.927; see also Fargnoli v. Halter, 247 F.3d 34, 43 (3d Cir. 2001) and Sykes, 228 F.3d at 266 n7.

With regard to the opinions of a treating source, such opinions will be given "controlling weight" on questions of the nature and severity of the claimant's impairment(s) when the conclusions are "well-supported by medically acceptable clinical

16

and laboratory diagnostic techniques and [are] not inconsistent with the other substantial evidence in [the] record." 20 C.F.R. §§ 404.1527(d) and 416.927(c); *see also* <u>Plummer v. Apfel</u>, 186 F.3d 422, 429 (3d Cir. 1999)("An ALJ may reject a treating physician's opinion outright only on the basis of contradictory medical evidence, but may afford a treating physician's opinion more or less weight depending upon the extent to which supporting explanations are provided.")

Both Dr. Wiegering and Dr. Francis examined Plaintiff only on a single occasion, at the request of the Pennsylvania Bureau of Disability Determination. As such, they were not considered treating sources. *See* 20 C.F.R. § 404.1502 (treating sources do not include medical sources who were consulted solely on a claimant's need to obtain a report in support of his/her claim for disability.) They did not perform any laboratory tests, evaluate any x-rays or other objective evidence, nor conduct any mental examinations except an analysis of Plaintiff's self-reported conditions. Although Ms. Cramer is correct that had their opinions been accepted by the ALJ at face value, she would have been found disabled, their conclusions are not the only medical evidence in the record.

For instance, about the same time Drs. Wiegering and Francis concluded that Plaintiff's ability to work was severely limited, her primary care physician, Dr. Lawrence Adams, asked a specialist

to evaluate her rheumatoid arthritis.  Dr. Anastacia Maldonado, a physician with the Altoona Arthritis and Osteoporosis Center ("Arthritis Center"), examined Ms. Cramer on September 22, 2003. (Tr. 212.)  Based on a neurological examination, Dr. Maldonado concluded that Ms. Cramer had intact motor strength.  (Tr. 213.) An examination of her musculoskeletal system showed positive swelling and tenderness bilaterally throughout her body, positive straight leg lifts, and multiple tender points.  (Id.)  It was Dr. Maldonado's impression that "the patient is most likely having inflammatory arthritis complicated by fibromyalgia." She explained different treatment options for rheumatoid arthritis and fibromyalgia to Ms. Cramer, as well as other types of medication to replace the ones she was taking at that time to control her pain. Ms. Cramer declined all of the alternative treatments and medications proposed.  (Tr. 213-214.)

Despite her claims that she was in constant pain, Ms. Cramer did not return to the Arthritis Center until a year later, on September 9, 2004.  Dr. Shelly Kafka, described by the ALJ as a rheumatologist, noted that Ms. Cramer left "mad" on her previous visit because she "wanted pain medication and was told that is not what was going to be given."  (Tr. 306.)  Ms. Cramer reported morning stiffness of less than 30 minutes on average, with pain in her legs, ankles, lower back, shoulder and hands.  On physical

examination, Dr. Kafka noted some mild synovitis[19] and multiple tender points. Her impression was of rheumatoid arthritis showing mild activity, but she was not certain this was the correct diagnosis. (Tr. 307.) X-rays of Ms. Cramer's hands and feet showed periarticular osteopenia (reduced bone mass in the joints), some soft tissue swelling, and the "possibility of an inflammatory arthropathy." (Tr. 308.) In a follow-up appointment on September 30, 2004, Ms. Cramer reported average morning stiffness of two hours, sometimes lasting all day. She continued to note pain in her neck, shoulders and legs, moderate fatigue and difficulty sleeping. (Tr. 304-305.) Although Ms. Cramer reported no significant side effects from methotrexate and azathioprine, it appears that Dr. Kafka changed her medication to enbrel following this appointment.

On November 11, 2004, Ms. Cramer reported that since her medication had been changed, she had more energy but no significant difference in pain. (Tr. 302.) Her morning stiffness was reported to be three hours or more. Her lower back was reported as feeling "fairly well," although still sore and made worse by lifting and bending. There was increased swelling in her hands, but she had "no new complaints." (Tr. 302.) Again, only mild synovitis was

---

[19]   Synovitis is defined as inflammation of the synovium, the membrane between the joints. It is usually painful, particularly on motion, and is characterized by a fluctuating swelling due to effusion within a synovial sac. *See* www.merck.com, Dorland's Illustrated Medical Dictionary.

noted in some joints.  (Tr. 303.)

On January 31, 2005, Ms. Cramer reported morning stiffness of two hours and increasing pain, moderate fatigue and mild difficulty sleeping.  Dr. Kafka noted there was no significant synovitis. Plaintiff was offered alternative medication but decided to continue with enbrel and did not report any side effects from that medication.[20]  (Tr. 299-300; see also Tr. 306.)

In February 2004, Dr. Adams recommended that a podiatrist examine Ms. Cramer when she complained of chronic pain in her right foot.  Dr. Guy J. Werkhoven examined Ms. Cramer on February 2, 2004.  He noted that she was "in apparent poor health," and appeared to be in "mild to moderate pain."  (Tr. 255.)  There was no acute edema in her lower extremities and muscle strength was noted as 5/5.  Muscle mass was symmetrical and the range of motion in her ankles was "slightly restricted yet smooth and non-crepitus in nature."  Dr. Werkhoven treated Ms. Cramer for a stress fracture and prescribed crutches, along with a post-operative shoe.  (Tr. 255.)  A follow-up examination on May 3, 2004, showed no pain with vibratory fork examination and no redness or edema in the painful area.  (Tr. 254.)

---

[20]   At the hearing, Plaintiff testified that enbrel caused fatigue and "massive headaches" lasting several days.  (Tr. 58-59.)  However, the Court has been unable to find any reference to complaints of chronic headaches in the medical record and her fatigue is described constantly as "moderate."

Plaintiff makes an additional argument regarding Dr. Francis's opinion; that is, she claims it is not mentioned in decision and therefore one is unable to determine the weight given to his opinion or why the ALJ rejected it. (Plf.'s Brief at 8.) However, this argument is simply inaccurate. Judge Abruzzo cited Dr. Francis's report extensively, albeit not by name. For instance, he noted with regard to Plaintiff's social functioning, she "has become more withdrawn and irritable," focusing "her attention on her pain rather than on interaction with others." (Tr. 16, *citing* Exhibit 11F, Dr. Francis's consultative exam notes.) He further comments that her concentration, persistence and pace were slow because of her pain, the focus of most of her day (id.) and that "there is some suggestion in the evidence that some of the claimant's pain may be psychosomatic" (Tr. 18, again citing Dr. Francis's report.) As a one-time consultative examiner, Dr. Francis's opinions were entitled to some, but not controlling weight. The ALJ's decision reflects the consideration he gave to those opinions.

The Court concludes that the ALJ properly gave less weight to the opinions of Drs. Wiegering and Francis, one-time examiners, than to the opinions of Drs. Kafka, Werkhoven, and Adams, all of whom treated Plaintiff on multiple occasions and at least two of whom are specialists in the type of impairments of which Ms. Cramer complains. Moreover, unlike the opinions of Drs. Wiegering and

Francis, their opinions are supported by objective medical tests, e.g., physical examinations, blood tests, x-rays, and medication monitoring. (*See*, e.g., Dr. Kafka's notes of September 9, 2004, Tr. 306-308.) Moreover, the treating physicians' opinions are consistent in that although they note Ms. Cramer's subjective complaints of pain, fatigue and stiffness, they describe her rheumatoid arthritis, fibromyalgia, and associated symptoms as "mild to moderate," with only "slightly restricted" or unrestricted range of motion. (Even Dr. Wiegering noted that there was no muscle atrophy and that her reflexes and fine muscle dexterity were within normal ranges.) Thus, there is a consistency among opinions of the treating physicians from which the ALJ could reasonably conclude that Plaintiff's impairments were not as debilitating as Drs. Wiegering and Francis considered them to be.

Based on a comprehensive reading of the decision, we conclude the ALJ not only considered all the medical evidence in the record, he properly gave greater weight to the opinions of Plaintiff's treating physicians than to those of the one-time examiners. Plaintiff's motion for summary judgment to be granted in her favor because the ALJ failed to properly evaluate the medical opinions in the record pursuant to 20 C.F.R. §§ 404.1527 and 416.927 must therefore be denied.

   C.   Argument 2: Failure to Provide a Rationale for
        Finding Plaintiff Could Perform Light Work Activity

        Plaintiff argues that because residual functional

22

capacity is a medical determination, the ALJ is precluded from making such an assessment without medical expert testimony or other medical evidence to support his decision.    In particular, he may not rely on an "outdated" RFC assessment by a non-examining medical source when the assessment is not based on the entire record. (Plf.'s Brief at 9, *citing* <u>Frank v. Shalala</u>, 47 F.3d 935, 937 (8th Cir. 1993).)    According to Plaintiff, the only support for the ALJ's conclusion that she was capable of light work is the opinion of the state agency medical consultants who, as the ALJ admitted, did not review all the medical evidence of record and did not observe Ms. Cramer.    The only opinion regarding RFC based on an actual examination was that of Dr. Wiegering who concluded that Ms. Cramer's residual capacity was far less than that required for light work.    (<u>Id.</u> at 10.)

The ALJ noted in his decision that the state agency medical consultants who evaluated the evidence had concluded Plaintiff was capable of a range of light work with some non-exertional limitations.    (Tr. 18, *citing* Exhibits 12F, 13F, and 14F.)    Because Plaintiff does not question the ALJ's analysis of her non-exertional limitations in determining her RFC, we address only the physical aspects of that determination, specifically the differences between the RFC assessment dated January 20, 2004, and Dr. Wiegering's assessment of October 21, 2003, which we have discussed in detail above.

On January 20, 2004, a medical consultant (whose name is illegible) completed a physical assessment of Plaintiff's RFC. (Tr. 245-252.)  He/she concluded that Plaintiff was able to lift and carry objects weighing up to 20 pounds on occasion and up to 10 pounds frequently; stand, walk and/or sit for six hours out of eight; and had unlimited push-pull capability. (Tr. 246.)  Despite a medical report in the record that Plaintiff's motor strength was only 3 on a scale of 0 to 5, she was able to perform some hand functions and walk unassisted.  The consultant noted that such limited motor strength was inconsistent with her walking ability. (Tr. 250.)  He/she specifically referred to Dr. Wiegering's note stating that her range of motion "in general appear[s] to be well preserved."  (Tr. 247.)  In the consultant's opinion, Plaintiff would be restricted to occasional climbing, balancing, and crawling but would be able to frequently stoop, kneel, and crouch.  (Tr. 247.)  There were no manipulative limitations except with regard to gross manipulation and no visual or communication limitations. (Tr. 248-249.) The only environmental limitation noted was to avoid concentrated exposure to extreme cold, wetness, vibrations and hazards.  (Tr. 249.)  The consultant also commented that the finding in the report dated October 24, 2003 (by deduction, Dr. Wiegering's report) that Plaintiff was able to lift and carry no more than two or three pounds "may not be fully consistent with evidence provided."  (Tr. 251.)

24

As Plaintiff correctly acknowledges, an ALJ is not required to adopt any particular medical opinion concerning RFC and may develop his own conclusions based on medical evidence of record. (Plf.'s Brief at 10.) Like the question of disability, the final conclusion about a claimant's residual functional capacity is a decision reserved to the Commissioner. 20 C.F.R. §§ 404.1527 (e)(2), 416.927(e)(2). Even treating source opinions on issues reserved to the Commissioner are not entitled to controlling weight or special significance. Social Security Ruling 96-5p, "Medical Source Opinions on Issues Reserved to the Commissioner."[21] Dr. Wiegering's opinion regarding Plaintiff's RFC, based on a single consultative examination some two years prior to the hearing, is therefore not entitled to the level of deference Plaintiff seems to urge this Court to adopt.

We find Plaintiff's reliance on Frankl easily distinguished and, in fact, believe the case undermines her argument. In Frankl, a hearing before an ALJ was held in December 1991. In his subsequent decision, the ALJ determined that the claimant was capable of performing a full range of light work based on medical records from August and September 1990 and on RFC forms completed

---

[21] "Social Security Rulings are agency rulings published 'under the authority of the Commissioner of Social Security' and 'are binding on all components of the Social Security Administration.'" Sykes, 228 F.3d at 271, citing 20 C.F.R. § 402.35(b)(1). "Rulings do not have the force and effect of the law or regulations but are to be relied upon as precedents in determining other cases where the facts are basically the same." Sykes, id., quoting Heckler v. Edwards, 465 U.S. 870, 873 n3 (1984).

in January 1991 by non-examining physicians.  Frankl, 47 F.3d at 937-938.  The Court of Appeals rejected the ALJ's analysis for two reasons: First, the RFC reports could not have been based on the full record of the case, including medical records compiled after January 1991 which showed that Frankl's condition had deteriorated significantly.    Second, the ALJ had improperly rejected as conclusory and non-controlling two medical affidavits from August 1991 that Frankl's medical impairments "substantially" limited his ability to work, and failed to give them the appropriate weight due statements of treating physicians.  Id. at 938.

Here, in a similar fashion, Dr. Wiegering's conclusion that Plaintiff was not capable of performing even sedentary work was not based on the complete medical record.  The hearing was held on May 17, 2005; Dr. Wiegering's evaluation was based on an examination dated October 21, 2003.  As in Frankl, the record shows numerous medical treatments in the interval between the consultant's examination and the hearing.  For instance, we calculate that Ms. Cramer saw Dr. Adams some 25 times in that period.  (Tr. 259-264; 276-280.)  She returned to the Arthritis Center in September 2004 after a year's absence, and was examined on four occasions by Dr. Kafka who, as noted above, found only mild rheumatic arthritis activity.  She was treated by Dr. Werkhoven from February through May 2004, who noted "mild to moderate pain," normal muscle strength in her legs and feet, and only "slightly restricted" range of

26

motion in her ankles. In short, the evidence here shows that in direct contrast to the situation in Frankl, multiple treating physicians found Ms. Cramer's condition was significantly less debilitating in the period immediately prior to the hearing than that proposed by Dr. Wiegering some 17 months before.

Moreover, in arriving at his conclusion that Plaintiff was capable of a limited range of light work with some non-exertional limitations, the ALJ explicitly cited nearly all the medical evidence in the record[22] as well as Plaintiff's testimony about her limitations and the activities questionnaire she submitted in September 2003. (See Exhibit 5F, Tr. 132-142.) The ALJ had numerous medical reports from examining sources, not only the opinion of the state agency medical consultant, on which to base his conclusion concerning Plaintiff's RFC. In fact, Judge Abruzzo specifically referred to and accepted Dr. Wiegering's objective findings based on his physical examination of Ms. Cramer, affording them more weight than his summary conclusions. (Tr. 17.) See Landeta v. Comm'r of Soc. Sec., No. 05-3506, 2006 U.S. App. LEXIS 20905, *14 (3d Cir. Aug. 14, 2006), citing Cotter v. Harris, 642 F.2d 700, 705 (3d Cir. 1981) (the ALJ must state which evidence supports the result reached and indicate any evidence which was considered but rejected.) At the same time, the ALJ is not

---

[22] In this section of his analysis, the ALJ refers explicitly and accurately to medical records, Exhibit F- 3 through 6, 8, 9, 11 through 14, 16, 18 and 19.

required to identify or refer to every item in the record. Fargnoli, 247 F.3d 34 at 42. Plaintiff's argument that the ALJ made "no attempt to explain how he arrived at his conclusion that the claimant could perform light work" is simply not correct in view of Judge Abruzzo's detailed summary of the medical evidence, Plaintiff's daily activities and her testimony.

We conclude the ALJ's determination that Ms. Cramer had sufficient residual functional capacity to perform a limited range of light work (and by implication, sedentary work) was based on substantial medical evidence, along with other evidence of record, all of which he thoroughly considered and explained in his decision. Plaintiff's second basis for seeking summary judgment in her favor must therefore be denied.

An appropriate order follows.

September _28_, 2006

_William L. Standish_
William L. Standish
United States District Judge

cc:  Charles T. Pankow
     955 Liberty Avenue
     Pittsburgh, PA 15222
     Email: cpankow@aol.com

     John J. Valkovci, Jr.
     United States Attorney's Office
     319 Washington Street
     Room 224, Penn Traffic Building
     Johnstown, PA 15901
     Email: john.valkovci@usdoj.gov